—FOR PUBLICATION—

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HANDONG WEN,** | |
| **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| | **NO.  15-1328** |
| **ROBERT E. WILLIS and FOXCODE, INC.,** | |
| **Defendants.** | |

## <u>OPINION</u>

Plaintiff Handong Wen alleges that he was induced by Defendants Foxcode, Inc. ("Foxcode") and its principal Robert Willis (collectively, the "Defendants") to invest $4 million in a fraudulent scheme.  Wen alleges that he invested money with Foxcode and Willis in a limited liability company created by the parties for Wen's benefit, but that Foxcode and Willis instead siphoned off most of his investment for their own personal use and profit.  He brings seven claims under federal and state securities laws, as well as common law.  Before the Court is the Defendants' motion to dismiss.  They argue that several of Wen's claims are barred by the gist of the action doctrine and, in any event, he has failed to state claims for relief under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  For the reasons that follow, the motion shall be granted in part and denied in part.

## I.  BACKGROUND

Wen is a citizen of the People's Republic of China who is currently enrolled as an undergraduate student at Temple University.  Compl. ¶ 2, 5.  Willis is the principal of Foxcode, an investment and merchant banking firm.  *Id.* ¶ 6.

According to the allegations in the Complaint, in or around the middle of 2013, Willis represented to Wen that, if Wen placed a $4 million investment with the Defendants, they would

manage that investment for his benefit, deliver a return on the investment, and guarantee the $4 million principal would be returned in full when the investment concluded. *Id.* ¶ 7.[1] Wen agreed to make the investment, and the Defendants created two entities under the laws of Delaware as a vehicle to receive Wen's funds—Foxcode Far East, LLC ("FFE") and Foxcode Capital Markets, LLC ("Foxcode Capital"). *Id.* ¶¶ 9-10. In reliance on the Defendants' representations, Wen signed the Foxcode Far East, LLC Agreement ("FFE Agreement"). *Id.* ¶ 17. By the terms of the FFE Agreement, Wen would contribute $4 million in exchange for a 99.9% membership interest in FFE, and Foxcode Capital would contribute $4000 for a 0.1% membership interest while providing "all finance advis[ory] services necessary to generate earnings for Foxcode Far East LLC." Compl. Ex. A at 3-4. Foxcode Capital was to be paid 2% of the committed capital upon execution of the agreement and on each year thereafter as a management fee. *Id.* at 7. Foxcode Capital was also entitled to a "Performance Fee," equal to 30% of all distributions made to Wen over his committed capital plus an annual return of 15%. *Id.*

FFE was to be managed by its members, Wen and Foxcode Capital. Compl. Ex. A at 8 ¶ 22. As managers, Wen and Foxcode Capital had the ability to bind FFE in contract. *Id.* at 8 ¶ 23. Each could call a member meeting, given appropriate notice to the other was provided. *Id.* at 9 ¶ 27. Each could withdraw and dissolve the company after 24 months. *Id.* at 9 ¶ 30. Each had the power to demand FFE's books and records. *Id.* at 14 ¶ 40. Wen himself had the power to request an independent valuation of FFE if at any time he had reason to believe the net assets of the company fell below $2.5 million, and if that valuation determined that the net equity value

---

[1] Wen also states in the Complaint that Willis and Foxcode offered to "help [him] get in to the Wharton School of Business," Compl. ¶ 7, but as Wen's response in opposition does not respond to the Defendants' argument, raised in their motion to dismiss, that Wen has failed to allege sufficient facts to state a claim under this theory, the Court deems that argument unopposed. *See Dale v. Abeshaus*, No. 06-4747, 2013 WL 5379384, at *14 n.76 (E.D. Pa. Sept. 26, 2013) ("[I]f a plaintiff fails to respond to all of the arguments raised in a motion to dismiss, the court may grant the motion as uncontested with respect to those arguments.").

of the company was lower than that amount, he had the sole authority to dissolve the company.

*Id.* at 12 ¶ 37(d).  And the following actions required the unanimous consent of Wen and Foxcode Capital:

> (a)  Incurring company liabilities over $3000;
>
> (b)  Incurring a single transaction over $3000;
>
> (c)  The sale of any Company asset with a fair market value over $3000;
>
> (d)  Hiring an employee with an annual compensation over $10,000;
>
> (e)  Termination of any employee;
>
> (f)  Assignment of ownership rights of Company property;
>
> (g)  Endangering the ownership or possession of Company property;
>
> (h)  Assignment of check signing authority;
>
> (i)  Releasing any Company claim except for payment in full; and
>
> (j)  Any actions described in item a, b, or c that result in any monthly accumulated amount of item a, b, or c higher than $10,000, respectively.

*Id.* at 20-21 ¶¶ 63(a)–(j).

After signing the agreement, Wen delivered the $4 million to FFE via two wire transfers made on July 22 and July 25, 2013.  Compl. ¶ 20.  Wen alleges that, rather than investing the money for his benefit, in accordance with the FFE Agreement, the Defendants drained the money out of FFE's bank account, transferring nearly all of it into their own accounts.  *Id.* ¶ 23.  By way of example, on December 23, 2013, Willis made a wire transfer of $1 million from FFE into his personal bank account.  *Id.* ¶ 24.  And by the end of March 2014, the Defendants had transferred all but approximately $26,000 of the original $4 million out of FFE's bank account and into the Defendants' accounts.  *Id.* ¶ 25.  Neither Wen nor any representative of his consented to these transfers of funds to personal accounts.  *Id.* ¶ 26.

Wen began to suspect that his investment had been dissipated without adequate compensation and without providing any return to him.  *Id.* ¶ 27.  He inquired of Willis on several occasions as to the performance and status of the investment and/or to seek the return of the $4 million and the return thereon, but received no satisfactory response, despite the fact that the FFE Agreement provides that "Foxcode Capital Markets will submit a monthly written report of any of the above actions together with Cash Flow and Balance Sheet statements to Handong Wen or his authorized agent."  *Id.*; Compl. Ex. A at 21.  Through counsel, Wen also requested that Willis produce all documents to show what happened to the money.  Compl. ¶ 28.  Wen made several requests and Willis promised to produce the records, but the records have not been produced in full.  *Id.* ¶ 29.  According to Willis, many of the records he should have kept were never created and do not exist.  *Id.*  The Defendants produced only a self-prepared general ledger, balance sheet, and profit and loss statements, as well as tax returns and a few emails.  *Id.* ¶ 30.  On the balance sheet provided by the Defendants, $3,885,457.39 of Wen's $4,000,000.00 investment is recorded as having been "loaned" to Willis, personally, and to Foxcode.  *Id.* ¶ 31. Of the $114,542.61 not recorded as loaned to Willis, $80,000 was paid to Foxcode as a "consulting" expense.  *Id.* ¶ 32.

Wen alleges that the Defendants secured a profit or return on the "loaned" funds of at least $5.6 million (over and above the $4 million in principal), which they have kept for their own benefit.  *Id.* ¶ 33.

Wen filed a seven-count Complaint in this Court on March 16, 2015.  In it, he asserts claims against the Defendants for: (1) fraud; (2) fraud in the inducement; (3) securities fraud under federal law; (4) securities fraud under Pennsylvania law; (5) conversion; (6) misappropriation; and (7) breach of fiduciary duty.  The Defendants contend that Wen's common law claims for

fraud, fraud in the inducement, conversion, misappropriation, and breach of fiduciary duty are all barred by the gist of the action doctrine.   They also argue that Wen has failed to allege sufficient facts to state any of his claims under Federal Rule of Civil Procedure 12(b)(6) and the heightened pleading requirements of Rule 9(b).

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "In light of *Twombly*, 'it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of [the proscribed conduct].'" *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  Consistent with the Supreme Court's rulings in *Twombly* and *Iqbal*, the Third Circuit requires a two-step analysis when reviewing a Rule 12(b)(6) motion.  *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010).  First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).  The Court must construe the facts and draw inferences in the light most favorable to the plaintiff.  *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 786 F.3d 284, 290 (3d Cir. 2014).  However, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Great Western Mining*, 615 F.3d at 177 (quoting *Twombly*, 550 U.S. at 556-57 (internal

quotation marks omitted)).  At bottom, the question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, —, 131 S. Ct. 1289, 1297 (2011).

## III.   DISCUSSION

The Defendants contend that any representations they made regarding the investment of the $4 million and the return on the investment are expressly covered by the FFE agreement, and those representations were either breached by Foxcode Capital or not.  As such, they argue that Wen's tort claims (fraud, fraud in the inducement, conversion, misappropriation, and breach of fiduciary duty) "are simply recast breach of contract claims" that are barred by the gist of the action doctrine.

The gist of the action doctrine "forecloses a party's pursuit of a tort action for the mere breach of contractual duties without any separate or independent event giving rise to the tort." *Sköld v. Galderma Labs., L.P.*, — F. Supp. 3d —, 2015 WL 1740032, at *9 (E.D. Pa. Apr. 17, 2015) (citations and internal quotation marks omitted).  The doctrine bars tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.

*eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 19 (Pa. Super. Ct. 2002) (citations omitted). The mere existence of a contractual relationship between the parties, however, does not preclude one party from bringing a tort claim against the other.  *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. 2001).

In its first foray into an analysis of the gist of the action doctrine—after a long history of predictive federal court and state court litigation on the same, *see id.* at *9 n.10 (collecting

cases)—the Pennsylvania Supreme Court, in *Bruno v. Erie Insurance Co.*, 106 A.3d 48 (Pa. 2014), summarized the doctrine's contours as follows:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Id.* at 68 (citations omitted). "Under *Bruno*, cases where tort actions are permitted to arise in the context of a contractual relationship are cases in which the defendant's alleged acts are 'not founded on the breach of any of the specific executory promises which compromise the contract.'" *Sköld*, 2015 WL 1740032, at *9 (quoting *Bruno*, 106 A.3d at 70).

### A.    *Fraud*

The Defendants contend that both Wen's fraud and fraud in the inducement claims should be barred by the gist of the action doctrine. *See* Mot. at 7-8; Reply at 2-3. Wen responds that because the fraud claims are "collateral to the investment contract, they sound in tort, not contract" and the gist of the action doctrine does not apply. Opp'n at 7.

It is the case, as Wen contends, that courts have suggested that claims of fraudulent inducement, as compared to fraudulent performance, tend to be "collateral to (*i.e.*, not 'interwoven' with) the terms of the contract itself," *eToll*, 811 A.2d at 17, and that claims of fraudulent inducement are "much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists." *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.,* 256 F.Supp.2d 329, 341 (E.D. Pa. 2003). However, it is equally the case, as the Defendants contend, that "[w]here the precontractual statements that are the basis for the fraudulent inducement claim concern specific duties that the parties later outlined in the alleged contract, courts have repeatedly dismissed such claims as sounding in contract and, thus, barred

by the gist of the action doctrine." *Integrated Waste Sol'ns, Inc. v. Goverdhanam*, No. 10-2155, 2010 WL 4910176, at *11 (E.D. Pa. Nov. 30, 2010).

Although not binding on this Court, the decision in *Vives v. Rodriguez*, 849 F. Supp. 2d 507 (E.D. Pa. 2012), is the most instructive and, ultimately, persuasive on this issue.  In determining the "essential (and thorny) question we must confront in applying the gist of the action doctrine" to the facts of that case—"whether (and when) the gist of the action doctrine applies to bar fraudulent inducement claims"—the court undertook a sweeping, in-depth analysis of the jurisprudence chronicling the interaction between the doctrine and fraudulent inducement claims before coming to the conclusion that "the Pennsylvania Supreme Court would find fraudulent inducement claims predicated upon misrepresentations as to a party's intent to perform under a contract to be barred by the gist of the action doctrine." *Id.* at 520.  Such a conclusion, the court found, "is consonant with decisions from this Circuit explaining that misrepresentations as to duties later enshrined in a contract are barred by the doctrine." *Id.* at 521; *see also Williams v. Hilton Grp. PLC*, 93 F. App'x 384 (3d Cir. 2004); *Penn City Invs., Inc. v. Soltech, Inc.*, No. 01-5542, 2003 WL 22844210 (E.D. Pa. Nov. 25, 2003); *Owen J. Roberts Sch. Dist. v. HTE, Inc.*, No. 02-7830, 2003 WL 735098 (E.D. Pa. Feb. 28, 2003); *Werner Kammann Maschinenfabrik, GmbH v. Max Levy Autograph, Inc.*, No. 01-1038, 2002 WL 126634 (E.D. Pa, Jan. 31, 2002).  Although the court recognized that more recent Superior Court rulings held that fraudulent inducement claims may be predicated on a party's intent not to perform, *see, e.g.*, *Brickman Grp., Ltd. v. CGU Ins. Co.*, 865 A.2d 918 (Pa. Super. Ct. 2004), it maintained that it was "wiser to follow the guidance of *eToll* and the courts of our Circuit" in holding that these types of fraudulent inducement claims should be barred by the gist of the action doctrine—"a decision fortified by our Court of Appeals's recognition that 'even if we were torn between two competing yet sensible

8

interpretations of Pennsylvania law . . . we should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of Pennsylvania decides differently.'"  *Id.* at 522 (quoting *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002)).[2]

Wen contends that both of his fraud claims "sound in the inducement, not in the performance of the contract," Opp'n at 9; thus, both claims are subject to the analysis outlined above.  In Count I of the Complaint, Wen alleges, in pertinent part, that Willis, "to induce [him] to provide Willis and Foxcode with the $4 million, on behalf of himself and Foxcode, represented to [him] that, if [he] placed a $4 million investment with Willis/Foxcode they would . . . manage Wen's $4 million investment for his benefit, deliver a return on the investment, and guarantee that the $4 million principal would be returned in full when the investment concluded."  Compl. ¶ 36.  In Count II, Wen alleges the following:

> 44.    To induce Wen [to] execute the Foxcode Far East LLC Agreement and to place the $4 million investment with Willis and Foxcode, through Foxcode Far East, Willis on behalf of himself and Foxcode represented to Wen that, if he did so, they would . . . manage Wen's $4 million investment for his benefit, deliver a return on the investment, and guarantee that the $4 million principal would be returned in full when the investment concluded.
>
> 45.    The representation that Willis and Foxcode would manage Wen's $4 million investment for his benefit, deliver a return on the investment, and guarantee that the $4 million principal would be returned in full when the investment concluded was further confirmed in the Foxcode Far East LLC Agreement.

*Id.* ¶¶ 44-45.  The allegations in both these counts—that the Defendants "would manage Wen's $4 million investment for his benefit, deliver a return on the investment, and guarantee that the $4 million principal would be returned in full when the investment concluded"—involve

---

[2]    The decision in *Bruno*, though it speaks in broad terms of looking to "the nature of the duty alleged to have been breached," 106 A.3d at 68, does not alter *Vives*'s holding that fraud in the inducement claims arising from the misrepresentation of an intention to perform under a contract are barred under the gist of the action doctrine. *See, e.g.*, *Paramount Fin. Commc'ns, Inc. v. Broadridge Inv'r Commc'n Sol'ns, Inc.*, No. 15-0405, 2015 WL 4093932, at *3 (E.D. Pa. July 7, 2015) (barring under the gist of the action doctrine, post-*Bruno*, plaintiffs' tort claims that were based on representations and omissions that were grounded in the defendant's duties under the contract and were later incorporated into the contract).

"misrepresentation[s] as to duties later enshrined in a contract," a point Wen affirmatively assents to in Paragraph 45 of the Complaint.  The FFE Agreement provides that: (1) Foxcode Capital Markets would "provide cash and all finance advis[ory] services necessary to generate earnings for Foxcode Far East LLC," Compl. Ex. A at 3 ¶ 6; (2) Wen would receive 99.9% of the Net Profits of the Company, *id.* at 3-4 ¶ 7; (3) when FFE was dissolved, Wen was guaranteed that Foxcode Capital would provide for the return of an amount sufficient to make the total distributions to Wen equal to $4 million, *id.* at 12 ¶ 37(d).

Each of the Defendants' misrepresentations Wen claims induced him to enter into the FFE Agreement was later incorporated into the FFE agreement.  Accordingly, the Court finds that the claims in both Counts I and II are barred by the gist of the action doctrine, and the motion to dismiss these counts shall be granted.

**B.     *Conversion*[3]**

The parties next dispute whether the gist of the action doctrine bars Wen's conversion claim.  The Defendants contend that it should because Wen's claim "is based solely on the failure to perform under a contract."  Mot. at 12 (citation and internal quotation marks omitted).  Wen responds that his allegations against the Defendants are not based on such a failure, but rather on the act of transferring his money to their own personal accounts for their benefit and profit.  Opp'n at 14.

"[W]here a tortious claim for conversion is based solely on the failure to perform under a contract, it is barred by the gist of the action doctrine."  *Vives*, 849 F. Supp. 2d at 516.  Many

---

[3]     At the outset, the Court finds that Wen cannot state a claim for misappropriation of monies, because the Court can find no evidence that such a cause of action exists under Pennsylvania law.  Both cases Wen cites in support of his contention, *Rehemtulla v. Hassam*, 539 F. Supp. 2d 755 (M.D. Pa. 2008), and *Westport Insurance Corp. v. Hanft & Knight, P.C.*, 523 F. Supp. 2d 444, 459-60 (M.D. Pa. 2007), did not recognize a "misappropriation" claim, but rather subsumed the plaintiffs' allegations regarding misappropriation under related claims of breach of fiduciary duties.  *See Rehemtulla*, 539 F. Supp. 2d at 776; *Westport*, 523 F. Supp. 2d at 448.  Thus, the Court shall grant the motion to dismiss the claim in Count VI and will proceed with the gist of the action doctrine analysis as it affects Wen's conversion claim.

state and federal courts in Pennsylvania, applying these principles, have barred conversion claims in which a plaintiff alleges that the defendant withheld money owed under a contract. *See, e.g.*, *id.* at 571 (dismissing plaintiff's conversion claim because she simply alleged that the defendant failed to turn over profits from a sale of property due under an agreement); *Kia v. Imaging Sciences Int'l, Inc.*, 735 F. Supp. 2d 256, 271 (E.D. Pa. 2010) (holding that such a "claim is therefore entirely dependent on the existence and validity of th[e] agreement, as there can be no liability in its absence"); *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. Ct. 2003) (holding that the plaintiff's "tort and breach of contract claims [were] inextricably intertwined, the success of the conversion claim depending entirely on the obligations as defined by the contract"). Were Wen's conversion claim based on the Defendants' failure to make distributions or other payments to him under the FFE Agreement, such a claim would be barred under the gist of the action doctrine. However, his principal allegation under this claim is that the Defendants "intentionally converted Wen's $4 million to their own use and benefit by, among other things, causing the funds to be transferred to Willis and Foxcode and/or 'loaning' the funds to Willis and Foxcode to use for their benefit instead of Wen's." Compl. ¶ 73. Such an allegation precisely implicates the "broader social dut[ies] owed to all individuals . . . imposed by the law of torts," such as a prohibition against theft, which "exist[] regardless of the contract." *Bruno*, 106 A.3d at 68. Accordingly, the gist of the action doctrine does not operate to bar Wen's conversion claim.

Turning now to whether the allegations in Wen's Complaint state a claim for conversion, conversion is defined under Pennsylvania law as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 529 (E.D. Pa. 2012) (quoting *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A.2d 875, 879 (Pa. Super. Ct.

1997)); *see also Stevenson v. Econ. Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964). "Money may be the subject of conversion only where the plaintiff had a property interest in the money at the time of the alleged conversion." *Kia*, 735 F. Supp. 2d at 270. However, section 18-701 of the Delaware Limited Liability Company Act provides that an LLC member "has no interest in specific limited liability company property." Del. Code Ann. tit. 9, § 18-701. Thus, once Wen transferred the $4 million to FFE, it became LLC property and he no longer had a property interest in it such that he is able to bring a conversion claim. *Cf. Burtch v. Opus, L.L.C.* (*In re Opus East L.L.C.*), 480 B.R. 561, 575 (Bankr. D. Del. 2012) (finding under section 18-701 that a Trustee lacked standing to bring a direct cause of action for conversion of an LLC's property because the sole member of the LLC had no interest in the LLC's property). Accordingly, the motion to dismiss Wen's conversion claim in Count V shall be granted.

### C.   *Breach of Fiduciary Duty*

FFE was formed "in accordance with the laws of the State of Delaware," with "rights and obligations of the Members . . . as stated in the Delaware Limited Liability Company Act." Compl. Ex. A at 2 ¶ 1. The Delaware Limited Liability Company Act contemplates that equitable fiduciary duties of care and loyalty will apply by default to a manager or manager member of a Delaware LLC. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012). The FFE Agreement provides that "Management of [FFE] is vested in the Members," defined as Wen and Foxcode Capital. Compl. Ex. A at 8 ¶ 22. It thus follows logically that the only entities owing any fiduciary duties under the FFE Agreement are its two managers, Wen and Foxcode Capital. But Foxcode Capital is not a party here.[4] Without naming Foxcode Capital as a defendant in this

---

[4]   Allegations in the Complaint (such as those that "Willis and Foxcode own, control and dominate the affairs of Foxcode Far East and Foxcode Capital Markets" or that "Foxcode Far East and Foxcode Capital Markets have never observed corporate formalities," Compl. ¶¶ 12, 14) do seem to suggest that Wen may seek to pierce the corporate veil to allege a breach of fiduciary duty claim against the named Defendants. *See Trs. of Nat'l Elev.*

case, Wen cannot proceed on his breach of fiduciary duty claim armed with only the allegations he makes regarding FFE and Foxcode Capital in the Complaint.  Thus, the motion to dismiss the breach of fiduciary duty claim in Count VII shall be granted, but the dismissal shall be without prejudice, and the Court shall grant Wen leave to amend his Complaint should he wish to address the deficiencies in this claim.

### D.    *Federal Securities Fraud*

The Defendants argue that Wen has failed to state a federal securities fraud claim because, as a threshold matter, his membership interest is not a "security."  Mot. at 15-18.  Wen responds that because the Defendants exercised "total control" over the $4 million investment, the Court should find that he has sufficiently pled he is a passive investor and that the FFE Agreement is an investment contract.  Opp'n at 17-18.

Before a plaintiff can invoke the protections of the anti-fraud provisions of the federal securities laws, that plaintiff must show that the alleged misconduct involves a purchase or sale of a "*security*."  *Steinhardt Grp., Inc. v. Citicorp*, 126 F.3d 144, 150 (3d Cir. 1997).  Section 2(a)(1) of the Securities Act of 1933 defines "security" as, *inter alia*, an "investment contract." 15 U.S.C. § 77b(a)(1).  An investment contract, not defined in the statute itself, has been defined by the Supreme Court as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  Based on this definition, the Third Circuit has held that the three elements for showing an investment contract are: (1) "an

---

*Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) (listing factors to consider when determining whether to pierce the corporate veil, including "gross undercapitalization, failure to observe corporate formalities, . . . siphoning of funds from the debtor corporation by the dominant stockholder, . . . and whether the corporation is merely a facade for the operations of the dominant stockholder" (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484-85 (3d Cir. 2001) (internal quotation marks omitted)).  However, Wen in his opposition is clear that any suggestion by the Defendants that he is seeking to pierce the corporate veil in this case "is incorrect."  Opp'n at 16 n.3.

investment of money"; (2) "in a common enterprise"; and (3) "with profits to come solely from the efforts of others." *Steinhardt*, 126 F.3d at 151.  The parties do not dispute that the first two elements are met, but disagree regarding whether Wen's interest in FFE meets the third requirement: that his profits were to come solely from the efforts of others.

According to the Third Circuit in *Steinhardt*, the seminal case on this issue, the inquiry under the third factor, determining "whether the investor has meaningfully participated in the management of the partnership in which it has invested such that it has more than minimal control over the investment's performance," begins and ends with the operating agreement.  *Id.* at 152-53.  The Court is to look at the agreement "as a whole, considering the arrangements the parties made for the operation of the investment vehicle in order to determine who exercised control in generating profits for the vehicle."  *Id.*  This issue "does not turn on whether the investor actually exercised its rights," but rather on "what 'legal rights and powers [were] enjoyed by the investor.'"  *Id.* at 155 (emphasis omitted) (quoting *Goodwin v. Elkins & Co.*, 730 F.2d 99, 107 (3d Cir. 1984)).

In their brief, the Defendants proffered a list of legal rights and powers Wen enjoyed as a member of FFE:

- Wen had a 99.9% ownership of the membership interests in FFE and was entitled to 99.9% percent of the profit.  Compl. Ex. A at 3-7 ¶ 7.

- Management of FFE is specifically vested in both Wen and Foxcode Capital Markets.  *Id.* at 8 ¶ 22.

- Wen had the ability to bind FFE in contract.  *Id.* at 8 ¶ 23.

- The amount of time to be devoted to the business of FFE was to be determined by both Wen and Foxcode Capital Markets.  *Id.* at 8 ¶ 24.

- Wen has the power to withdraw and cause the dissolution of FFE after 24 months (*i.e.*, July 17, 2015).  *Id.* at 9 ¶ 30.

- Wen has broad powers to demand the books and records of FFE.  *Id.* at 14 ¶ 40.  Wen has exercised that power.  Compl. ¶¶ 28-29.

- The following actions (essentially the entire conduct of FFE's business) require the consent of Wen or Mr. Kong:[5] (a) incurring company liabilities over $3,000; (b) incurring a single transaction over $3,000; (c) the sale of any company asset over $3,000; (d) hiring an employee with annual compensation over $10,000; (e) termination of any employee; (f) assignment of ownership rights of company property; (g) endangering the ownership or possession of company property; (h) assignment of check signing authority; and releasing any company claim; and (j) any actions described in (a), (b) or (c) that exceed $10,000/month in the aggregate.  Compl. Ex. A at 20-21 ¶ 63.

- Wen's consent is necessary to amend the FFE Agreement.  *Id.* at 21 ¶ 64.

- Wen enjoys a guarantee of the return of his investment.  *Id.* at 12 ¶ 37(d).

Mot. at 17 (citations altered).  The Defendants cite both *Steinhardt* and *Goodwin* as support for their contention that Wen has failed to show that his membership interest in FFE is a "security," pointing out that the Third Circuit concluded that the investments in both of those cases were not securities, and the investors in both of those cases had more limited powers than Wen enjoyed in FFE.  *See* Mot. at 16.   In *Steinhardt*, the investor had power to propose and approve a new business plan, power to veto a new business plan proposed by the general partner, and power to remove and replace the general partner without notice if the general partner "refuse[d] to act with such best efforts in pursuit of [the investor]'s proposals."  126 F.3d at 154.  In *Goodwin*, the agreement provided that the investor (in tandem with the other partners) had the power to (1) participate in the nomination, election, or removal of the executive committee and managing partner; (2) oversee the decisions of the executive committee and managing partner; and (3) decide new admissions to the partnership and involuntary terminations.  730 F.2d at 114 (Becker, J., concurring).  The Defendants also cite several district court cases within this Circuit holding that a membership interest in an LLC is not a security, each of which involved a

---

[5]   In Paragraph 76 of the FFE Agreement, Wen authorized Xiangyun "Ben" Kong as his attorney-in-fact for the purpose of the exercise of all authorities granted to Wen in the Agreement.  Compl. Ex. A at 23 ¶ 76.

complaining member who had equal or less control over the LLC than Wen had over FFE.[6] Considering the powers enjoyed by the plaintiffs in those cases, the weight of authority dictates that Wen's membership interest in LLC is not a security because he was granted significant control over FFE as a manager by the terms of the FFE Agreement.

Wen attempts to distinguish all of these cases from his own situation by arguing that they involved a plaintiff who "had in fact been actively involved in managing the company." Opp'n at 17 n.4. In contrast to those plaintiffs, he states, he "is not alleged to have been a sophisticated investor" and "did not in fact exercise any control over the investment." *Id.* at 18. He contends that the "allegations of total control by Foxcode and Willis over the investment show 'a significant variance between the terms of the [LLC Agreement] and the allocation of management power in fact.'" Opp'n at 18 (quoting *Rossi v. Quarmley*, 604 F. App'x 171, 174 (3d Cir. 2015)). In *Goodwin*, the genesis of this "significant variance" language, the Third Circuit found that a managing partner's alleged excesses, in apparent contravention of the terms of the operating agreement, did not transform the plaintiff's interest into a security. 730 F.2d at 112 (Seitz, C.J., concurring). The plaintiff there, much like Wen here, argued that he could not control the management of the firm, he was dissatisfied with management decisions, and he was denied access to information necessary to protect his investment. *Id.* at 113. But then–Chief Judge Seitz stated that "an unhappy minority partner does not a security holder make," and "the federal securities

---

[6]   *Rossi v. Quarmley*, 7 F. Supp. 3d 502 (E.D. Pa. 2014) (plaintiff could demand a vote on a particular interest at meetings, adopt rules of procedure at meetings, call upon individual members to make additional capital contributions, and remove officers at any time with or without cause), *aff'd*, 604 F. App'x 171 (3d Cir. 2015); *Braun v. Schwartz*, No. 12-6224, 2013 WL 5467084 (D.N.J. Sept. 30, 2013) (plaintiff had powers to acquire or dispose of property, invest company funds, purchase insurance on the company's assets, commence lawsuits, enter into any agreement, retain agents, borrow money and execute notes and mortgages, sell real estate, call meetings and solely establish quorum, vote at any meeting, make distributions at his discretion, and dissolve the company); *Sync Labs LLC v. Fusion Mfg.*, No. 11-3671, 2013 WL 4776018, at *10 (D.N.J. Sept. 4, 2013) (plaintiff had "extensive management responsibilities," including administration and organization of the company, market research, and investor relations); *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376 (D. Del. 2000) (plaintiff had power to remove the manager and to dissolve the company); *see also Robinson v. Glynn*, 349 F.3d 166, 170-72 (4th Cir. 2003) (plaintiff was involved in the management of the company and powers included selecting external financial and legal consultants and serving on the board of managers).

laws are not properly invoked to protect one general partner from the deceit of his copartners."
*Id.*  At bottom, a variance, even a significant one, between the powers enjoyed by a plaintiff-investor in an agreement and the operation of those powers in reality does not *per se* convert an interest from a nonsecurity into a security.

To the extent Wen relies on *Rossi*, a nonprecedential panel decision, in making a lack-of-sophistication argument, that reliance is misplaced.  The plaintiff there made a similar argument, invoking the court's suggestion in *Goodwin* that it might adopt the reasoning in *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981), in which the Fifth Circuit held that an investor in a partnership could have an interest that constituted an investment contract, despite the powers the governing agreement afforded him, "if he could show he was 'so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers.'"  *Rossi*, 604 F. App'x at 174 (quoting *Goodwin*, 730 F.2d at 106) (internal quotation marks omitted).  The panel declined to adopt the *Williamson* rule because the claim that the plaintiff was unsophisticated was belied by the fact that he had founded other companies with the defendants in the past and that he had successfully managed the partnership at issue.  *Id.* at 174-75.  Although it may be true that Wen is not as experienced in business as the *Rossi* plaintiff was, that fact alone does not persuade this Court to adopt the *Williamson* rule and apply it to his case when the Third Circuit would not do so under its existing jurisprudence.  The Third Circuit's directive on this is issue unchanged:

> It is manifest that any person who possesses the powers, rights, and responsibilities described above cannot have invested his capital with the expectation of profits derived *solely* from the efforts of others, and therefore cannot be the holder of a "security" as intended by the Act.  Whatever subjective perceptions [the plaintiff] may have entertained about his position in the firm, and whatever may have been the role he actually assumed, the *legal* interest which he enjoyed does not fall within the scope of the term "security" as intended by Congress.

*Goodwin*, 730 F.2d at 104.  The FFE Agreement is clear.  Wen enjoyed a plethora of powers as a manager-member of FFE and he had significant control over the management of the company. The allegation that he did not exercise those powers, or even the allegation that the Defendants thwarted his attempts to exercise those powers, does not make his interest in FFE a "security" for the purposes of bringing a claim under the federal securities laws.  Accordingly, the motion to dismiss the federal law securities fraud claim in Count III shall be granted.

> **E.**     ***Pennsylvania Securities Fraud***

Finally, the Defendants contend that Wen's claim for securities fraud under the Pennsylvania Securities Act ("PSA") fails for two reasons.  First, Wen has failed to adequately plead that his membership interest in FFE is a "security" under the PSA, because he has not stated facts sufficient to show that he did not participate actively in the management of FFE. Mot. at 20-21.  Second, Wen has failed to plead with particularity the scienter element required to make out a fraud claim, as mandated by Federal Rule of Civil Procedure 9(b).  *Id.* at 18-19, 21.  Wen counters that his Complaint alleges sufficient facts to show a lack of active participation and that he has pleaded scienter with particularity.  Opp'n at 19-21.

> **1.**     **Whether the FFE Agreement Is a "Security"**

The definition of "security" is slightly different under the PSA than under the federal Securities Act.  Section 102(t) of the PSA provides that a "security" presumptively includes any membership interest in a limited liability company, though the definition does not include:

> (v)   A membership interest in a limited liability company where all of the following conditions are satisfied:
>
> > (A)   The membership interest is in a company that is not managed by managers;
> >
> > (B)   The purchaser of the membership interest enters into a written commitment to be engaged actively and directly in the management of the company; and

        (C)   The purchaser of the membership interest, in fact, does participate
              actively and directly in the management of the company.

70 Pa. Cons. Stat. §§ 1-102(t)(v).  The parties do not dispute that the first condition is satisfied,

as the FFE Agreement provides that FFE was to be managed by its members.  Compl. Ex. A at 8

¶ 22.  The Defendants contend that the second condition is satisfied because the FFE Agreement

"includes numerous provisions permitting Wen to be engaged in the management of FFE," which

the Court discussed *supra*.  Mot. at 21.  Wen disputes this, stating that nothing in the FFE

Agreement "constitutes a written commitment to be engaged actively and directly in the

management of the company."  Opp'n at 21.  Guidance on this issue is sparse, given that there is a

dearth of case law defining what exactly is meant by "engaged actively and directly."  On the one

hand, the affirmative responsibilities of the day-to-day management of FFE are ascribed solely to

Foxcode Capital.  *See* Compl. Ex. A at 3 ¶ 6 ("This Member will provide cash and all finance

advis[ory] services necessary to generate earnings for Foxcode Far East LLC.").  On the other,

both Wen and Foxcode Capital are held to a "duty to devote time" pursuant to the FFE

Agreement, requiring them to "devote such time and attention to the business of the Company as

the majority of the Members will from time to time reasonably determine for the conduct of the

Company business," and, furthermore, any and all material transactions FFE entered into

required unanimous consent of Foxcode Capital and Wen (or his authorized agent).  *See id.* at 8 ¶

24; *id.* at 20-21 ¶ 63.  This condition is directed towards the responsibilities assigned in the

written commitment, rather than the practical circumstances of the investor's engagement in the

company; furthermore, the language of the statute does not require that a certain quantum of

active and direct engagement in the management of the company be defined, but rather suggests

that any amount will do.  The FFE Agreement provided for only two manager-members, each

with a duty to devote time and attention to the business of the company.  And, specifically,

paragraph 63 of the FFE Agreement enumerates a list of actions, essential for FFE to achieve its stated purpose, that require the unanimous consent of both Wen and Foxcode Capital, including incurring liabilities and transactions over $3000, hiring employees with an annual compensation over $10,000, terminating employees, assigning ownership rights of company property, and others. *See* Compl. Ex. A. ¶¶ 63(a)–(j). Taking these facts into consideration, the Court finds that the second condition is satisfied here: Wen did enter into a written commitment to be engaged actively and directly in the management of FFE.

The third condition calls for a factual inquiry—whether Wen did, *in fact*, participate actively and directly in the management of the company. The Defendants argue that Wen fails to allege that neither he nor his attorney-in-fact, Ben Kong, actively participated in the management of FFE. Wen argues that several of the allegations in the Complaint related to the Defendants' conduct satisfies this element:

> 25.     By the end of March 2014, Willis and Foxcode had transferred all but some $26,000 of Wen's $4 million out of Foxcode Far East's bank account and into the accounts of Willis and/or Foxcode.
>
> 26.     Neither Wen nor any representative of his consented to Willis using Wen's $4 million to loan money to himself or Foxcode. Rather, the $4 million was to be invested for Wen's benefit, not loaned to Willis/Foxcode for their own benefit.
>
> 27.     After Wen began to suspect that his $4 million investment had been dissipated without adequate explanation and without providing any return to Wen, he several times inquired of Willis as to the performance and status of this investment and/or to seek the return of the $4 million (and the return thereon), but received no satisfactory response.

Compl. ¶¶ 25-27. Viewing the inferences drawn from these allegations in the light most favorable to Wen, the Court finds that he has sufficiently pleaded that this condition does not apply. If Wen was an active participant in the management of FFE, an argument that he would allow the transfer of over 99% of his $4 million investment out of the FFE account and into the Defendants' personal accounts strains credulity. Further, if he were an active participant, he

would not have been kept in the dark regarding the reasons behind the dissipation of the investment or then frozen out when he inquired about the dissipation to Willis.  Because this third condition does not apply, Wen has thus established that his membership interest in FFE is a security for the purposes of making out a PSA securities fraud claim.

### 2.     Scienter

Section 1-401 of the PSA was enacted to address substantially the same wrongful conduct as Rule 10b-5, which was promulgated under Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).  Both prohibit false statements and omissions of material fact in connection with the sale of securities.  *Majer v. Sonex Research, Inc.*, 541 F. Supp. 2d 693, 712 (E.D. Pa. 2008).  "[I]t has long been the practice in this Circuit to treat section 1-401 claims as requiring the same elements of proof as required under Rule 10b-5."  *Leder v. Shinfeld*, 609 F. Supp. 2d 386, 395 (E.D. Pa. 2009) (citing *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 214 (3d Cir. 2001) (holding that section 1-401 "is modeled after Rule 10b-5 of the federal securities laws").  The elements of a claim of fraudulent misrepresentation or omission under Rule 10b-5 (and, thus, section 1-401) are: (1) a representation or omission; (2) which is material to the transaction at hand; (3) made or concealed falsely, with knowledge of its falsity or recklessness as to whether it is true or false, *i.e.*, scienter; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.  *Majer*, 541 F. Supp. 2d at 712 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).  And because a claim under section 1-401 is based on allegations of fraud, Federal Rule of Civil Procedure 9(b)'s requirement of pleading with particularity applies to this claim.  *Leder*, 609 F. Supp. 2d at 397.

In their brief, the Defendants contest only whether Wen has pleaded sufficient facts with particularity to allege that they acted with scienter.  "To establish liability, . . . a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 & 193 n.12 (1976)).  The relevant inquiry on this element "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  A plaintiff can satisfy this element by "(a) by alleging facts to show that [the] defendant[] had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).  In determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. "The inference . . . need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," but the plaintiff's complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* (citations and internal quotation marks omitted).

"To show conscious misbehavior or recklessness, a plaintiff must make specific allegations which constitute 'strong circumstantial evidence.'" *In re Urban Outfitters, Inc. Sec. Litig.*, — F. Supp. 3d. —, 2015 WL 2069222, at *11 (E.D. Pa. May 4, 2015).  The Defendants argue that Wen's Complaint "contains no allegations whatsoever that would support even a weak

inference that Willis did not intend to fulfill the promises he allegedly made" to invest Wen's money and provide a return on the investment.  Mot. at 19.  Wen responds that this argument "ignores the detailed allegations as to Defendants' state of mind set forth in the complaint." Opp'n at 19.  Wen points to the allegations, *inter alia*, that: (1) the Defendants drained the money out of FFE's bank account, transferring the money to his own account; (2) Willis transferred $1 million of Wen's money to his personal bank account in December 2013; (3) all but $26,000 had been transferred out of FFE's account by March 2014; and (4) Wen did not consent to his money being used as personal loans.  *Id.* at 19-20 (citing Compl. ¶¶ 22-26, 31-32).  In their reply, the Defendants assert that "[t]he object of forming FFE was to make performing investments for Wen, not to leave cash sitting in FFE's bank account," and the fact that money was moved by Willis out of FFE's account does not create an inference Willis was doing something illicit with his money.  Reply at 9.  To the contrary, they advance the "more plausible and compelling interest (or, at the very least, an equally plausible inference) is that Willis was doing precisely what he told Wen he would do with the money—invest it, not leave it in FFE's bank account."  *Id.*  They argue that the fact they moved Wen's money does not raise a strong inference of scienter.  *Id.*

Were these the only allegations on this point, the Defendants might prevail.  However, Wen alleges further that he attempted on several occasions to inquire of Willis as to the performance and status of his investment and was given no satisfactory response; that he, through counsel, requested several times that Willis produce all documents to show what became of his money; and then after several promises by Willis to produce the records, Willis did not produce the records in full, and according to Willis, many of the records he should have kept were never created and don't exist.  Compl. ¶¶ 27-29.  According to the FFE agreement, Foxcode Capital was required to submit to Wen a monthly written report of relevant actions requiring

unanimous consent of the members, along with cash flow and balance sheet statements.  Compl. Ex. A at 21.  The Court can infer from the allegations in the Complaint that this was not done, and that Wen was only made aware of the status of his account after several requests were made, both on his own behalf and through counsel.  If the Defendants' activities were nothing more than business-as-usual, as they contend, it is difficult to see why they gave Wen the runaround he alleges took place.  Even the Defendants' argument in their reply that the goal of FFE was "not to leave cash sitting in FFE's bank account" is dubious, given Wen's allegation that, when Willis finally produced the records, they noted only that the funds from Wen's investment were "loaned" to Willis and Foxcode.  If the Defendants were acting in complete accordance with their duties under the FFE Agreement, it would seem that the records they created would chronicle the investments they made with Wen's funds, not simply list transfers made to personal accounts.

This issue "ultimately rest[s] not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that that defendants acted with scienter."  *Inst'l Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).  Taking into account the totality of the circumstances and the facts contained in the Complaint, the Court finds that Wen has set forth sufficiently specific allegations that constitute "strong circumstantial evidence" of conscious misbehavior on the part of the Defendants.  *Urban Outfitters*, 2015 WL 2069222, at *11.  The Court concludes that a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  And because the Defendants disputed only the existence of the element of scienter, the Court finds that Wen has stated a claim for securities fraud under the PSA.  The motion to dismiss this claim shall be denied.

An appropriate Order follows.


Dated: **July 31, 2015**


                                        **BY THE COURT:**

                                        **/S/WENDY BEETLESTONE, J.**

                                        _____
                                        **WENDY BEETLESTONE, J.**